1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JEFFREY KEVIN GOMEZ,                )   No. C 04-0273 MMC (PR)
                                                     )
        Petitioner,              )   **ORDER DENYING PETITION FOR**
                                                     )   **A WRIT OF HABEAS CORPUS**
   v.                                   )
                                                     )
EDWARD ALAMEIDA, Warden,       )
                                                     )
        Respondent.            )
_____ )

     On January 21, 2004, petitioner Jeffrey Kevin Gomez, a California prisoner
proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28
U.S.C. § 2254.  On April 22, 2004, the Court ordered respondent to show cause why the
petition should not be granted based on petitioner's cognizable claims for relief.  Respondent
filed an answer accompanied by a memorandum and exhibits, and petitioner filed a traverse.

## PROCEDURAL BACKGROUND

     Petitioner, Larry Page ("Page") and Daniel Phillips ("Phillips") were charged in a 29-
count indictment in Santa Clara County Superior Court based on several criminal episodes.
Petitioner was convicted of 20 counts, Page was convicted of five counts, and Phillips's
motion for a mistrial was granted during trial.  The California Court of appeal summarized
the facts adduced at trial with respect to the charges resulting in conviction as follows:

United States District Court
For the Northern District of California

### Counts 2, 3 and 5 Involving Michelle Amaro

Michelle Amaro purchased a car for $2,500 from [Jeff] Gomez' sister-in-law.  After paying between $600 and $1,100 for the car, she made no further payments.  Claiming that Amaro still owed money for the car, Gomez demanded $1,400.  Although Amaro gave Gomez another car to settle the debt, that car's engine subsequently blew up.  Gomez then demanded that Amaro pay him  $2,500.  When Amaro said that she would not pay, Gomez told her he would "blow [her] fuckin' head off."  Gomez threatened Amaro over the telephone, saying that he would hurt her and her children if she did not pay the debt.  In late 1995, Gomez told Amaro that he had assigned the debt to Page, also known as Hogjaws.  Gomez, Page and a third person came to Amaro's house and told her that if she did not pay, they would take her Chevy Blazer.  Around that same time, Gomez and several others visited Amaro's house one night.  Gomez came at Amaro and kicked her between the legs with the metal tipped cowboy boots he was wearing.  Sam Grijalva, who lived in the same house as Amaro, testified that Gomez and Page came to the house and said they were going to take the Blazer as payment for the debt.  Page was holding a crowbar.  Using the crowbar, Page attempted to get into the car.

In January 1996, with the knowledge of the San Jose Police Department, Amaro met with Gomez.  When Amaro disputed the debt, Gomez threatened her and had his associate show her the butt of a concealed shotgun.

After Gomez and Page were arrested, Page said that he had gone to Amaro's house and tried to break into her car.

### Counts 6, 7, 8 and 9 Involving David and Sam Grijalva

David Grijalva lived with his father Sam and several other people.  He sold methamphetamine.  Gomez was his supplier.  When David began serving a jail term in August 1995, he still owed Gomez about $1,000.  David called Gomez to tell him he would get him the money.  Gomez said he would blow up David's house and his "whole fuckin' family" if he did not pay.  Gomez told Sam Grijalva that David owed him money.  Sam gave Gomez some tools to satisfy the debt.  Gomez took the tools but said the debt was not satisfied.  Gomez threatened to have David stabbed in jail if Sam failed to pay $2,800 which was more than was originally owed.  During the next few months, Gomez came to the house eight to 10 times to demand that payment be made.

### Counts 14, 15, 16, 17 and 18 Involving Franz Bachmeier/Rhonda Darby

Franz Bachmeier rented a room in a house in Campbell.  His girlfriend Rhonda Darby frequently stayed at the house.  On December 10, 1995, Rhonda discovered Gomez, Page, and another associate in the house.  Gomez lunged at Franz, and hit him, telling him that this was "all about respect."  Page also lunged at Franz.

About a week later, Gomez, Page and their associate burst into Franz's room.  Page lunged at Franz and hit him in the head with an axe.  Page and Gomez pushed Franz onto a bed and began beating him.  Page used a fire extinguisher to hit Franz in the head.  Franz hit Gomez with a child's bat and gored Page's eye.  When Rhonda screamed, Page grabbed her purse, told her to shut up and said he "was going to fuckin' kill [her]" if she told anybody what happened.  Before leaving, Gomez took Franz's pager and items from Rhonda's purse.  Franz was bleeding profusely from the head, and suffered extensive injuries.  After being arrested, Page told police that his eye was poked during a fight in which he beat up Franz Bachmeier.

### Counts 19, 20, 21, 22 and 23 Involving Susan Tucker and Mark Thompson

Susan Tucker and Mark Thompson were involved in a counterfeit check cashing operation.  Susan, Mark and several other people were staying at the Sheraton in Milpitas.  On January 12, 1996, Gomez and Page burst into the hotel room, holding big flashlights and yelling.  They used their fists and

1   flashlights to beat Mark.  Gomez hit and kicked Susan on the face and head,
2   knocking out Susan's front tooth.  Gomez took $100 from Susan and forced her
    to write a note staying that she had sold her car to him.  Gomez said he would
3   beat her up if she did not sign the note.  Gomez also forced Mark to sigh his car
    over.  Before leaving, Gomez took Susan's jewelry and other property.

    ***Counts 25, 26 and 27 involving Gilbert McKnight***

4       In January 1996, Pat Scavone and Daniel Phillips picked Gilbert
    McKnight up at his house and took him to Ed Sanchez's garage.  Gilbert and
5   Gomez argued, and Gilbert was injured.  Michelle Coleman witnessed the
    fighting.  Gomez and two other men returned with Gilbert to Gilbert's house.
6   Diane Saucedo, who was briefly present at Gilbert's house, noticed that Gilbert
    had blood on his head and shirt.  Gomez was carrying a sawed up shotgun.
7   Gilbert's girlfriend, Deborah Bernal, heard the men forcing Gilbert to place
    telephone calls to his friend, Danny Winslow.  Bernal saw that Gilbert had
8   been beaten and was bleeding from the nose and mouth.  One of the men left
    with Gilbert.  They arrived at Winslow's house.  Danny Winslow noticed that
9   Gilbert was not acting like himself and asked the men to leave.  Gilbert later
    told Winslow that the men had shown up at his house earlier that night, beat
10  him up, and forced him to try to get Danny out of his house.

11  People v. Gomez, et al., No. A090570, slip op. at 3-5 (Cal. Ct. App. Feb. 14, 2003)

12  (hereinafter "Slip Op.") (attached as Resp.'s Ex. 3).

13      Following trial, petitioner was convicted of the following 20 crimes: conspiracy to

14  commit terrorist threats, assaults with force likely to produce great bodily injury and

15  extortion (Count 1); with respect to the incident involving Michelle Amaro ("Amaro"),

16  extortion (Count 2), terrorist threats (Count 3), and attempt to take a vehicle (Count 5); with

17  respect to the incident involving David Grijalva ("Grijalva"), terrorist threats (Counts 6 and

18  8) and extortion (Count 9); with respect to the incident involving Franz Bachmeier

19  ("Bachmeier") and Rhonda Darby ("Darby"), first degree burglary (Counts 14 and 16),

20  assault with a deadly weapon or by force likely to produce great bodily injury (Counts 15 and

21  17), and attempted robbery of an inhabited dwelling (Count 18)[1]; with respect to the incident

22  involving Susan Tucker ("Tucker") and Michael Thompson ("Thompson"), assault with a

23  deadly weapon or force likely to produce great bodily injury (Counts 19 and 20), extortion

24  (Counts 21 and 22), and robbery (Count 23); and with respect to the incident involving

25  Gilbert McKnight ("McKnight"), kidnaping (Count 25), assault with a deadly weapon or

26  force likely to produce great bodily injury (Count 26), and being a felon in possession of a

27  _____

28      [1]This crime was a lesser-included offense of the first-degree robbery charged in Count
    18.

firearm (Count 27).  (Resp.'s Ex. 1, Clerk's Transcript ("CT") at 3876.) [2]  Additionally, petitioner admitted to having been convicted of two prior violent and/or serious "strike" felonies and one prior serious felony.  The trial court sentenced him to 325 years to life in state prison, to run consecutively to a 6-year determinate term.  The California Court of Appeal affirmed petitioner's conviction, but modified the sentence to strike one 25-year-to-life term.  The California Supreme Court summarily denied the petition for review.

Petitioner thereafter filed the instant petition, raising the following claims of constitutional error: (1) the trial court's admission into evidence of McKnight's grand jury testimony violated his constitutional rights to confrontation and to present a defense; (2) the trial court's allowing McKnight to invoke the Fifth Amendment right against self-incrimination in the presence of the jury violated petitioner's constitutional rights to confrontation and to present a defense; (3) the trial court's exclusion of exculpatory evidence violated petitioner's constitutional rights to confrontation and to present a defense; (4) the prosecution's failure to provide transcripts of non-testimonial grand jury proceedings violated petitioner's right to due process; (5) the trial court's denial of petitioner's requested modification of CALJIC 2.20 violated petitioner's right to due process; (6) the trial court's denial, without an in camera review, of petitioner's request for discovery of the records of an investigating officer violated petitioner's constitutional right to obtain potentially exculpatory information; (7) the trial court's refusal to instruct the jury on the "claim of right" defense violated petitioner's constitutional rights; (8) the trial court's use of CALJIC No. 17.41.1, concerning jury misconduct, violated petitioner's constitutional right to an impartial jury; and (9) the cumulative effect of the foregoing errors violated petitioner's right to due process.[3]

[2]Page was convicted of conspiracy to commit terrorist threats, assaults with force likely to produce great bodily injury and extortion (Count 1); with respect to the Amaro incident, extortion (Count 2) and attempt to take a vehicle (Count 5); and with respect to the Bachmeier/Darby incident, first degree burglary (Count 16), assault with a deadly weapon or by force likely to produce great bodily injury (Count 17), and attempted robbery of an inhabited dwelling (Count 18).  (CT at 3877.)

[3]A tenth claim, that the case should be "remanded" to the trial court for resentencing, was dismissed in the Court's April 22, 2004 Order to Show Cause, because it was based on state law.

United States District Court

For the Northern District of California

**DISCUSSION**

A.      Standard of Review

        This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

        A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Habeas relief is warranted only if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 796 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  A federal court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

B.      Petitioner's Claims

        1.      Grand Jury Testimony

        Petitioner claims his right to due process was violated when the prosecution failed to provide him with transcripts of non-testimonial grand jury proceedings.[4]  The prosecution provided defense counsel with a transcript of the grand jury testimony of the witnesses, but not of the non-testimonial portions of the proceedings.  (CT at 1-392.)  Prior to trial, defense counsel moved for production of a transcript of the legal instructions, comments on the evidence or legal arguments made by the prosecutor to the grand jury, and any questions by the grand jurors or discussions between the prosecutor and the grand jurors about the

_____

        [4]This is the fourth claim in the petition.  Petitioner's claims are addressed herein in the chronological order of the state court proceedings on which they are based.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  testimony.  (CT at 2351.)  The motion was granted, but the prosecutor indicated that

2  transcripts of these non-testimonial portions of the proceedings were not available.  (CT at

3  2431, 3185-86; Resp.'s Ex. 2, Reporter's Transcript ("RT") at 642, 734.)  Defense counsel

4  then moved for dismissal of the indictment, which the trial court denied.  (RT at 917.)  A writ

5  to the California Court of Appeal raising this issue was denied, and, following trial, defense

6  counsel filed a motion for a new trial arguing, inter alia, that the prosecution never produced

7  the transcripts.  (CT at 3971-85.)  The new trial motion was denied.  (RT at 4924.)

8      On appeal, the California Court of Appeal rejected, for lack of prejudice, petitioner's

9  claim that he was improperly denied the transcripts of the non-testimonial grand jury

10  proceedings, holding:

11          Gomez must show that the failure to obtain transcripts of the non-testimonial
           grand jury proceedings resulted in an actual prejudice relating to his conviction
12          after jury trial.  This Gomez fails to do.  Although he points to the admission of
           the grand jury testimony of McKnight, that testimony was admissible, as
13          already explained, pursuant to Evidence Code section 1370.  Among other
           things, Gomez says he was prejudiced because he did not receive a transcript of
14          questions the grand jurors may have asked the prosecutor and says he received
           no information about whether the grand jurors were ever informed of the
15          narcotic use of some of the grand jury witnesses. Gomez utterly fails, however
           to show how having information about the non-testimonial grand jury
16          proceedings prejudiced him with respect to his conviction after a jury trial in
           which many of those grand jury witnesses were questioned and cross-
17          examined.  At this point in the proceedings, Gomez must show prejudice
           impacting his *trial*.  He has failed to do so and that is fatal to his claim.
18
   Slip. Op. at 17 (emphasis in original).
19
20      In his instant petition, petitioner cites no Supreme Court precedent, and the Court is

21  aware of none, providing that a defendant has a constitutional right to the transcripts of non-

22  testimonial grand jury proceedings, or that the failure to provide a defendant with such

23  transcripts violates his right to due process.  As discussed above, AEDPA mandates that

24  habeas relief be granted only if the state courts have acted contrary to or have unreasonably

25  applied federal law as determined by the United States Supreme Court.  Williams v. Taylor,

26  529 U.S. at 412 ("Section 2254(d)(1) restricts the source of clearly established law to [the

27  Supreme] Court's jurisprudence.").  Consequently, in the absence of Supreme Court

28  precedent holding the right to due process includes a right to receive transcripts of non-

United States District Court

For the Northern District of California

1 testimonial grand jury proceedings, habeas relief cannot be granted on such claim.

2 Moreover, even if such a right had been recognized by the Supreme Court, petitioner, for the

3 reasons stated by the California Court of Appeal, has not shown he suffered actual prejudice

4 from the failure to receive the transcripts of the non-testimonial grand jury proceedings. See

5 Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (holding habeas relief requires showing of

6 "actual prejudice," specifically, that the error had "a substantial and injurious effect or

7 influence in determining the jury's verdict").

8 　　　　Accordingly, petitioner is not entitled to habeas relief on this claim.

9 　　　　2.　　Admission of McKnight's Grand Jury Testimony

10 　　　　Petitioner contends his right to confrontation was violated when McKnight's grand

11 jury testimony was admitted at trial.  McKnight was the victim alleged in Counts 24 through

12 27, specifically, burglary, kidnaping, assault with a deadly weapon or force likely to produce

13 great bodily injury, and being a felon in possession of a firearm.  The trial court granted a

14 motion to dismiss the burglary charge, and petitioner was convicted of the last three charges.

15 (CT at 3878-3910.)

16 　　　　The prosecution subpoenaed McKnight to testify at trial, but when questioned on the

17 stand, McKnight invoked the Fifth Amendment privilege against self-incrimination with

18 respect to any questions concerning the incident forming the basis of the charges against

19 petitioner.  (RT at 2637-44.)  McKnight was excused subject to recall, and later the

20 prosecution's request to give McKnight "use immunity" was granted.  (RT at 2887-92.)

21 Petitioner's attorney then requested that if McKnight continued to refuse to testify on the

22 ground he feared for his or his family's safety, that any statements by McKnight to that effect

23 be made outside the jury's presence.  (RT at 2893.)  The trial court denied this request.  (Id.)

24 　　　　When, several days later, the prosecution re-called McKnight to testify, the trial court

25 explained to McKnight that because of the grant of immunity, he no longer had the right to

26 refuse to answer questions, and that he could be held in contempt if he refused.  (RT at

27 3041.)  McKnight refused to answer the prosecutor's questions, explaining that if he went

28

United States District Court

For the Northern District of California

back to prison he would not expect to live if "it gets out that I have testified."[5]  (RT at 3043.)

The trial court found McKnight to be in contempt.  (RT at 3041-53.)[6]  The prosecutor then

moved to admit McKnight's grand jury testimony pursuant to California Evidence Code §

1370.[7]  (RT at 3053-61.)  The trial court took the prosecutor's request under submission

pending cross-examination of McKnight.  (RT at 3060.)  On cross-examination by defense

counsel, McKnight refused to answer any questions, and the trial court held him in contempt.

(RT at 3061-71.)  The trial court then admitted McKnight's grand jury testimony pursuant to

California Evidence Code § 1370, over objection by defense counsel, and the testimony was

read to the jury.  (RT at 3073, 3300.)  The California Court of Appeal found the evidence

admissible under state law, and also found no violation of the Confrontation Clause under

Idaho v. Wright. See Idaho v. Wright, 497 U.S. 805, 816 (1990) (citing standard for violation

---

[5]At the time of the questioning, McKnight was in prison but was due to be paroled the following Monday.  (RT at 3043.)

[6]During the course of this questioning, also before the jury, the prosecutor asked McKnight about his grand jury testimony, and McKnight stated that he testified at the grand jury because he feared that if he did not, he would be charged with a probation violation and lose custody of his daughter.  (RT at 3044-45.)

[7]California Evidence Code § 1370 provides:
(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:
(1) The statement purports to narrate, describe or explain the infliction or threat of physical injury upon the declarant.
(2) The declarant is unavailable as a witness pursuant to Section 240.
(3) The statement was made at or near the time of the infliction or threat of physical injury.  Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.
(4) The statement was made under circumstances that would indicate its trustworthiness.
(5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official.
(b) For purposes of paragraph (4) of subdivision (a), circumstances relevant to the issue of trustworthiness include, but are not limited to, the following:
(1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested.
(2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.
(3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section."

of Confrontation Clause as set forth in <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980)).  (Slip Op. at 8-11.)

After the California Court of Appeal's decision, the United States Supreme Court substantially revised the analysis for determining whether the admission of out-of-court statements violates the Confrontation Clause.  <u>See</u> <u>Crawford v. Washington</u>, 541 U.S. 36, 60 (2004).  Respondent argues <u>Crawford</u> does not apply retroactively to cases on federal habeas review, and that petitioner's claim is instead governed by <u>Roberts</u> and <u>Wright</u>, the law in effect prior to <u>Crawford</u>.  In a recent decision, the United States Supreme Court held <u>Crawford</u> announced a "new rule" that cannot be applied retroactively to cases on habeas review.  <u>See</u> <u>Whorton v. Bockting</u>, No. 05-595, slip op. 1, 14 (U.S. Feb. 28, 2007) (citing <u>Teague v. Lane</u>, 489 U.S. 288 (1989)).  Consequently, the instant claim is governed by the federal law in effect prior to <u>Crawford</u>, under which the admission of a hearsay statement does not violate the Confrontation Clause if it either falls within a "firmly rooted" hearsay exception, or bears "particularized guarantees of trustworthiness."  <u>Roberts</u>, 448 U.S. at 66-68; <u>Wright</u>, 497 U.S. at 816.

The Court of Appeal, citing <u>Wright</u>, found the admission of the grand jury testimony did not violate the Confrontation Clause because California Evidence Code § 1370 is similar to the "firmly rooted" hearsay exception for spontaneous statements, and, in any event, contains "particularized guarantees of trustworthiness," in that it requires statements be made "'at or near the time of the incident, by a person who experienced the incident, firsthand'"; it requires "'circumstances indicating trustworthiness, including whether it had been made in contemplation of litigation, whether the declarant had a bias or motive to fabricate, and whether it was corroborated by other evidence not admissible under section 1370'"; and it requires the statement "'to have been recorded in writing or electronically.'"  (Slip Op. at 8-9 (quoting <u>People v. Hernandez</u>, 71 Cal.App.4th 417, 424 (1999)).  As the Court of Appeal applied the correct federal standard in determining the admission of petitioner's grand jury testimony did not violate the Confrontation Clause, the denial of this claim was not "contrary to" federal law under 28 U.S.C. § 2254(d)(1).  The Court of Appeal's finding California

United States District Court
For the Northern District of California

1  Evidence Code § 1370 similar to the "firmly rooted" exception for spontaneous statements

2  and, in any event, to contain "particularized guarantees of trustworthiness" also was

3  "reasonable" under 28 U.S.C. § 2254(d)(1).  Consequently, habeas relief is not warranted on

4  the basis of the state court's denial of petitioner's claim that admitting McKnight's grand jury

5  testimony violated the Confrontation Clause.

6      Moreover, even if the admission of McKnight's grand jury testimony had been in

7  error, habeas relief would not be warranted because, in the context of the other evidence

8  adduced at trial, the admission of such testimony was harmless.  Confrontation Clause claims

9  are subject to harmless error analysis.  See Hernandez v. Small, 282 F.3d 1132, 1144 (9th

10  Cir. 2002) (applying Brecht harmless error standard to Confrontation Clause error on habeas

11  review).

12      The California Court of Appeal found the error to be harmless because "[m]any other

13  witnesses testified about the incident involving McKnight, including Deborah Bernal, Ed

14  Sanchez, Patricia Scavone[8] and Michelle Coleman.  There was abundant evidence apart from

15  McKnight's grand jury testimony to support the convictions."  (Slip Op. at 11.)  Where, as

16  here, the state court found a constitutional error to be harmless, federal courts must, for

17  purposes of application of the "unreasonable application" clause of § 2254(d)(1), determine

18  whether the state court's harmless error analysis was objectively unreasonable.  Medina v.

19  Hornung, 386 F.3d 872, 878 (9th Cir. 2004).

20      After reviewing the record, the Court finds the  Court of Appeal reasonably could find

21  the admission of McKnight's grand jury testimony harmless because it was cumulative of the

22  testimony of other witnesses at trial.  McKnight testified before the grand jury that Patricia

23  Scavone-Nance ("Scavone-Nance") came to his house on January 20, 1996,[9] that he

24  accompanied her outside where Phillips hit him on the side of his head with a gun before

25  forcing him into a Mustang, and that Phillips, Scavone-Nance and another woman took him o

26

27      [8]In the trial transcript, Patricia Scavone also is referred to as "Patricia Scavone-Nance."

28

      [9]At trial Phillips, on occasion, was referred to by his nicknames "Wolfie" and "Wolf."

10

United States District Court

For the Northern District of California

1  a garage where petitioner was waiting.  (CT at 210-20.)  McKnight further testified that at the

2  garage, petitioner, Phillips and two others knocked him down and kicked him in the face,

3  side and ribs.  (CT at 221-24.)  McKnight testified he was then brought back to his apartment

4  by Martin Lopez ("Lopez") and several others, where they were met by petitioner and

5  Phillips, who drove separately.  (CT at 228-29.)  McKnight testified that at McKnight's

6  house, petitioner forced him to call Danny Winslow ("Winslow") to try to get him to come

7  over.  (CT at 232.)  When that failed, Phillips forced McKnight to ride with him to

8  Winslow's house, but Winslow refused to come out; Phillips took McKnight back to the

9  apartment where petitioner was waiting for them.  (CT at 235-40.)  Eventually, petitioner,

10  Phillips and the other people at McKnight's apartment left.

11       Numerous witnesses gave an account similar to McKnight's grand jury testimony with

12  respect to petitioner's role in the kidnaping of McKnight.[10]  (RT at 4744.)  Scavone-Nance

13  testified at trial that she, Phillips and a woman named "Trish" took McKnight in a Mustang

14  from McKnight's house to a garage belonging to Eddy Sanchez ("Sanchez"), where

15  petitioner was waiting for them.[11]  (RT at 2933-45.)  Scavone-Nance further testified that

16  after the incident involving petitioner and McKnight in Sanchez's garage, she and Lopez

17  took McKnight back to McKnight's apartment, while Phillips and petitioner drove there

18  separately.  (RT at 2950-58.)  Deborah Bernal ("Bernal"), who was living with McKnight at

19  the time, testified that on the evening of the incident, Scavone-Nance came to the apartment

20  and that Scavone-Nance and McKnight left together; later that evening, they returned with

21  Phillips, Lopez, and petitioner, who "forced" their way inside.  (RT at 1846-60.)  She also

22  testified that while they were at the apartment, Phillips directed McKnight to call Winslow to

23  try to get him to come over, and that McKnight seemed to be "intimidated" by both Phillips

24  and petitioner, who was holding a sawed-off shotgun.  (RT at 1857-60.)  Bernal also testified

25

26       [10]The prosecution's theory with respect to the kidnaping charge was that petitioner
   was "working" with the others and they were "all acting together for a common goal, all
27  conspiring together."  No one, including McKnight, testified that petitioner himself took
   McKnight anywhere.

28       [11]Neither Phillips nor "Trish" testified at trial.

United States District Court

For the Northern District of California

1   that Phillips and McKnight then left again, and returned about 20 minutes later, while

2   petitioner waited in the apartment.  (RT at 1860-62.)  Finally, Winslow testified that

3   McKnight called him several times that night, that McKnight was not acting like "himself,"

4   and that he later came to Winslow's house with Phillips.  (RT at 2791-2800, 2805-08, 2828.)

5   Winslow further testified that, a short time later, he rode his bike to McKnight's house and

6   McKnight told him that Phillips and other men had beaten him up, had then come to his

7   apartment and forced him to call Winslow, and had then forced him to go with Phillips to

8   Winslow's house in order to persuade Winslow to come over.  (RT at 2826-28.)

9        With respect to petitioner's assault on McKnight, McKnight's grand jury testimony

10  was that petitioner, Phillips and two others jumped on him, knocked him down and kicked

11  him in the face, side and ribs.  (CT at 221-24.)  At trial, Winslow testified that McKnight told

12  him on the evening of the incident that several men had beaten him up, knocked him to the

13  ground, and kicked him repeatedly in the face and the side with their boots.[12]  (RT at 2828,

14  2839-40.)  Winslow also testified that at that time and in the days following the incident,

15  McKnight looked beaten up, had a black eye, had cuts and lacerations on his face, and

16  complained of pain in his side.  (RT at 2829, 2839-40.)  Lastly, four other witnesses testified

17  they saw McKnight on the night of or shortly after the incident and noted that he had been

18  injured.  In particular, Scavone-Nance testified McKnight's lip looked "messed up" after the

19  incident in Sanchez's garage (RT at 2960-61); Bernal testified she saw McKnight that

20  evening and he was bleeding from his face, nose and mouth (RT at 1848-50); Diane Saucedo

21  testified that she came to McKnight's apartment that evening and saw McKnight had blood

22  on his head and shirt (RT at 2114-18); and Nancy Davis-Winslow testified she saw

23  McKnight the next day and he looked like he had been "beaten up" (RT at 2770).

24       Finally, with respect to petitioner's possession of a gun, McKnight had testified at the

25  grand jury, which testimony was introduced at trial, that petitioner had a sawed-off shotgun

26  at Sanchez's garage and also when he returned to McKnight's apartment.  (CT at 216-20,

27

28       [12]Petitioner does not contend the trial court improperly admitted the out-of-court
     statements McKnight made to Winslow.

232.)  At trial, Bernal testified she saw petitioner with a sawed-off shotgun when he was at her apartment with McKnight, (RT at 1857-60), and Winslow testified that McKnight told him on the evening of the incident that petitioner had been at McKnight's apartment with a sawed-off shotgun.  (RT at 2879.)

As set forth above, the testimony of other witnesses at trial provided the jury with the same account of petitioner's role in the McKnight incident as the account set forth in McKnight's grand jury testimony.  There was no indication that McKnight's grand jury testimony was more convincing or credible than that of the other witnesses.  Indeed, the jury learned from McKnight, as well as from other witnesses, that McKnight was a drug user and dealer, and the jury itself observed McKnight's repeated acts of contempt of court.  The jury also heard evidence of McKnight's potential motivation for giving grand jury testimony favorable to the prosecution; McKnight testified at trial that the reason he had testified before the grand jury was that he feared he otherwise would be prosecuted for violating probation and lose custody of his child.  Cf. United States v. Bridgeforth, 441 F.3d 864, 868 (9th Cir. 2006) (holding lack of opportunity for cross-examination does not violate Confrontation Clause if jury otherwise provided with sufficient information to evaluate witness's biases and motivation).  As McKnight's grand jury testimony was cumulative of the testimony of numerous other trial witnesses, and the jury heard evidence that allowed them to assess, and indeed question, McKnight's credibility as a witness, the Court of Appeal reasonably could conclude that the admission of McKnight's grand jury testimony was, even if erroneous, harmless.[13]

Accordingly, petitioner is not entitled to habeas relief on this claim.

3.    Fifth Amendment Privilege

Petitioner claims his rights to due process and to confrontation were violated because

---

[13]For the same reasons, this Court also finds the admission of the grand jury testimony to be harmless under the Brecht standard.  See Medina, 386 F.3d at 877 (holding that even where state court's harmless error analysis is objectively unreasonable, habeas relief is not warranted if error harmless under Brecht standard).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  McKnight invoked his Fifth Amendment privilege in front of the jury.[14]  When McKnight

2  initially invoked his privilege against self-incrimination, the jury was not present.  (RT at

3  2637-44; see also Slip Op. at 11.)  Petitioner cites to McKnight's later appearance in the trial,

4  however, at which time McKnight attempted to invoke the privilege and the trial court

5  informed him he no longer had such a privilege because in the interim he had been granted

6  use immunity.  (RT at 2887-92, 3041-53, 3061-71.)  At that point, McKnight continued to

7  refuse to answer a series of questions posed to him, which resulted in his being held in

8  contempt.  (Id.)

9       Petitioner's concern is that McKnight, on one of the occasions in which he invoked

10  the privilege in the jury's presence, explained that his reason for doing so was his fear that he

11  would be in danger of physical harm if he testified.  (RT at 3043.)  Unfavorable testimony

12  standing alone does not constitute a due process violation, however.  Moreover, petitioner

13  was not prejudiced thereby, as McKnight did not testify to any fear that he would be harmed

14  by petitioner, but rather to a general fear that any inmate who testifies for the prosecution

15  will obtain what is sometimes referred to as a "snitch jacket" and thereby risk harm from

16  other inmates if, in the future, he was returned to jail.  (Id.)[15]

17       In any event, petitioner cites no Supreme Court precedent, and the Court is aware of

18  none,  providing that a defendant's rights to due process and/or confrontation are violated

19  when a witness invokes a Fifth Amendment privilege in the jury's presence.  As discussed

20  above, AEDPA mandates that habeas relief may be granted only if the state courts have acted

21  contrary to or have unreasonably applied federal law as determined by the United States

22  Supreme Court.  Williams v. Taylor, 529 U.S. at 412 ("Section 2254(d)(1) restricts the

23  source of clearly established law to [the Supreme] Court's jurisprudence.").  Consequently,

24  in the absence of Supreme Court precedent recognizing a claim based on a witness's

25  invocation of the Fifth Amendment privilege before the jury, habeas relief cannot be granted

26

27       [14]This is the second claim in the petition.

28       [15]As noted, McKnight was scheduled to be released from custody.

United States District Court

For the Northern District of California

1    on such a claim.[16]

2        Accordingly, petitioner is not entitled to habeas relief on this claim.

3        4.    Exclusion of Evidence

4        Petitioner claims the exclusion of evidence violated both his due process rights and his

5    Sixth Amendment right to confront adverse witnesses.  The excluded evidence petitioner

6    cites is evidence of: (1) Bachmeier's past acts of violence, including those committed against

7    his ex-girlfriend, Darby, which evidence petitioner wanted to introduce during cross-

8    examination of Bachmeier and Darby, and also during the defense case (RT 1391-92, 1399-

9    1401, 1679, 1682, 3851-52); (2) Amaro's past acts of violence against her ex-husband, which

10   evidence petitioner sought to introduce  both during cross-examination of Amaro and in the

11   defense case  (RT at 2074-76, 3833-40); and (3) the facts behind Bernal's prior conviction, as

12   well as questions regarding her alleged emotional instability, which evidence petitioner

13   sought to elicit on cross-examination (RT at 1879, 1882-83, 1965-69).  The trial court

14   excluded the foregoing evidence because the evidence had no or limited probative value, was

15   prejudicial, and presented a risk of confusion of issues if admitted.[17]

16       "State and federal rulemakers have broad latitude under the Constitution to establish

17   rules excluding evidence from criminal trials."  Holmes v. South Carolina, 126 S. Ct. 1727,

18   1731 (2006).  This latitude is limited, however, by a defendant's constitutional rights to due

19   _____

20       [16]In his petition for review to the California Supreme Court, petitioner cited two
     decisions in which that Court had held it improper for a witness to invoke the Fifth
21   Amendment privilege before the jury.  See People v. Mincey, 2 Cal. 4th 408 (1992); People
     v. Frierson, 53 Cal. 3d 730 (1991).  As discussed, federal habeas relief may not be based on
22   decisions of a state court.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding
     federal habeas relief unavailable for violations of state law).  Moreover, the two cases cited
23   by petitioner held that a defendant does not have a right to have a co-defendant invoke the
     Fifth Amendment privilege in the jury's presence, for the reason that, under state law, a jury
24   may not infer that such invocation is because such witness, rather than the defendant, is
     guilty.  See Mincey, 2 Cal. 4th at 441 (citing Cal. Evid. Code § 913); Frierson, 53 Cal. 3d at
25   743 (same); see also Cal. Evid. Code § 913 (providing no inference may be drawn from
     exercise of privilege).

26

27       [17]California Evidence Code § 351 provides that "relevant evidence is admissible."
     Section 352 provides: "The court in its discretion may exclude evidence if its probative value
     is substantially outweighed by the probability that its admission will (a) necessitate undue
28   consumption of time or (b) create substantial danger of undue prejudice, of confusing the
     issues, or of misleading the jury."

United States District Court

For the Northern District of California

1    process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.

2    See id. "While the Constitution [ ] prohibits the exclusion of defense evidence under rules

3    that serve no legitimate purpose or that are disproportionate to the ends that they are asserted

4    to promote, well-established rules of evidence permit trial judges to exclude evidence if its

5    probative value is outweighed by certain other factors such as unfair prejudice, confusion of

6    the issues, or potential to mislead the jury." Id. at 1732.  Similarly, the Confrontation Clause

7    does not prevent a trial judge from imposing reasonable limits on cross-examination based on

8    concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is

9    repetitive or only marginally relevant.  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986);

10   see Bridgeforth, 441 F.3d at 868 (holding limitation on cross-examination does not violate

11   Confrontation Clause if jury otherwise has sufficient information to evaluate witness's biases

12   and motivation).

13        In this case, the exclusion of the evidence and restrictions on petitioner's cross-

14   examination did not violate either his right to due process or his right to confrontation.  In

15   each instance, the evidence had minimal, if any, relevance, was prejudicial, and was likely to

16   cause confusion and mislead the jury.  The Court of Appeal upheld the exclusion of the

17   evidence and in doing so discussed its inadmissibility under California Evidence Code §§

18   351 and 352, as follows:

19            We conclude that the trial court did not abuse its discretion in excluding the
             evidence.  The trial court could have found the evidence regarding Bachmeier's
20           violence irrelevant since there was no self-defense theory before the court.  The
             court could have decided that Bachmeier's alleged violence was not a material
21           fact in deciding whether Gomez and Page assaulted and robbed Bachmeier and
             Darby.  The domestic abuse evidence could have been found collateral and
22           dissimilar to the assaults by Gomez and Page.  Further, the trial court acted
             within its discretion in excluding evidence relating to Bernal since evidence of
23           her hospitalization and depression was already before the jury.  Similarly, the
             evidence of the fact of Bernal's prior convictions had also been admitted.  The
24           trial court also acted within its discretion in excluding evidence of Amaro's
             violent relationship with her former husband since the evidence could be
25           deemed irrelevant and more prejudicial than probative under Evidence Code
             section 352.
26

27   Slip Op. at 14-15.

28        Additionally, the district court, in denying the federal habeas petition filed by Page,

United States District Court

For the Northern District of California

1   petitioner's co-defendant, found the exclusion of the evidence regarding Bachmeier was both

2   constitutional and harmless, as follows:[18]

3          The application of § 352 to exclude the evidence in this case did not
    result in a constitutional violation. Both state courts considered the
4   surrounding circumstances and reached their conclusion that any relevance was
    outweighed by the consumption of time and issue confusion that would occur it
5   the evidence was admitted. In determining that Page's right to present a
    defense was not violated, this court has considered the several factors that have
6   been identified to determine whether the exclusion of evidence violated the
    right to a fair trial or to present a defense: the probative value of the excluded
7   evidence on the central issue; the evidence's reliability; whether the evidence is
    capable of evaluation by the trier of fact; whether it is the sole evidence on the
8   issue or merely cumulative; and whether the excluded evidence constitutes a
    major part of the attempted defense. See Chia v. Cambra, 360 F.3d 997, 1004
9   (9th Cir. 2004), cert. denied, 544 U.S. 919 (2005); Drayden v. White, 232 F.3d
    704, 711 (9th Cir. 2000), cert. denied, 532 U.S. 984 (2001). The probative
10  value of the excluded evidence was not particularly strong because
    Bachmeier's criminal activities did not prove or disprove Page's guilt and were
11  only relevant to the believability of his statements about the sequence as to who
    hit who first (which pertained to whether Page hit Bachmeier in self-defense).
12  On the evidence in the record, Bachmeier's violence apparently was only
    relevant to impeach his credibility in general. The evidence's reliability was
13  questionable because Bachmeier had not suffered a conviction and apparently
    had not even faced criminal charges for most of the events Page wanted to
14  explore. The evidence also would not have been capable of ready evaluation
    by the jury. There is no indication that Bachmeier would have conceded all the
15  alleged episodes of violent behavior, so his violence would have to be
    established through other witnesses. Page presumes that Bachmeier's
16  reputation for violence and history of particular violent acts could have been
    shown in a quick and direct evidentiary presentation, but the evidentiary
17  presentation would have been far murkier and dragged-out than he thinks.
    Efforts to make the point likely would have resulted in a mini-trial (of
18  Bachmeier's acts of violence) within a trial (of the guilt of Page and Gomez)
    that would have taken much time and would have been very confusing to the
19  jury. The trial court was rightly concerned about the trial getting side-tracked
    on the collateral issue of Bachmeier's previous behavior and on the collateral
20  issue of the impeachment of the witnesses who would testify about his alleged
    violence – the latter concern arising in part from the fact that so many people
21  involved had significant histories of drug use and criminal records. The
    evidence was the only evidence on the point of Bachmeier's violence, but that
22  was a collateral point. Bachmeier's criminality in general and his drug usage
    was explored at trial, so the jury had some idea of Bachmeier's credibility in
23  general.
           Page emphasizes heavily that the trial court's error was especially bad
24  because evidence of Bachmeier's violence was so necessary to Page's self-

25

26

27  ───────────────

28  [18]Page challenged the exclusion of the same evidence regarding Bachmeier, but did
    not also challenge the exclusion of the above-described evidence regarding Amaro and
    Bernal. The exclusion of that evidence is discussed separately, infra.

defense theory as set out in the testimony of Robin Abela.[19]  There are two main problems with this argument.  First, Abela did not testify until late in the trial and the trial court's rulings before she testified did not have the benefit of that testimony.  The first few times the defense argued that evidence of Bachmeier's violence was necessary to support the self-defense theory, the trial court said there was not yet evidence of self-defense to warrant the admission of the evidence of the victim's alleged violent character under § 1103.  Page's counsel asserted that Page would be testifying to self-defense, but the trial court noted that Page always had the option to decide not to testify and therefore was not going to allow the evidence based on testimony that may or may not occur.  See RT 1397 (if Page did not testify, there would be evidence of the victim's state of mind "without any connect[ion] or nexus with the alleged state of mind of the defendant at the time that this incident occurred.")  Second, Abela's testimony did not provide the self-defense evidence necessary to make the evidence of the victim's other acts of violence relevant to it.  In her testimony, Abela recounted what Bachmeier had told her a few days after the incident when she went to see him at the hotel where he was hiding.  Abela testified that Bachmeier told her that Page hit him with a fire extinguisher when Bachmeier rushed at him with a baseball bat.  RT 4222.  However, that evidence was stricken as hearsay.  Regardless of the hearsay problem, the entirety of Abela's testimony does not show self-defense.  Abela testified that Bachmeier told her that the three men showed up at his residence because he owed Page some money and things "went sour" before the fire extinguisher/baseball bat exchange occurred.  See RT 4218.  Indeed, Abela had been told that things had soured enough that Rhonda Darby had threatened to call the police before Bachmeier allegedly rushed at Page with a baseball bat.  RT 4226.  Abela admitted she told the investigator Bachmeier told her he had been beaten up by the threesome, and admitted that she told the investigator they were there to collect on a debt.  RT 4226.  Page's self-defense theory takes Abela's testimony out of context, as does his argument that her testimony supports his version that Bachmeier "grabbed a baseball bat and started the fight, after which petitioner was forced to defend himself and hit Bachmeier with a fire extinguisher."  Memo. Of Points And Authorities In Support Of Amended Petition, p. 7.  The whole of the picture Abela painted in recounting Bachmeier's story to her was that the threesome showed up to collect a drug debt and things soured to the point where someone threatened to call the police and then Bachmeier rushed at Page with a baseball bat and Page hit him with a fire extinguisher.  Those facts do not provide evidence of self-defense to make relevant the collateral exploration into Bachmeier's alleged reputation for violence under § 1103.

        After consideration of the factors identified in Chia, the court is convinced that the exclusion of evidence about Bachmeier's violence and reputation for violence did not violate Page's federal constitutional right to present a defense.  The state appellate court's rejection of the claim was not contrary to or an unreasonable application of clearly established Federal law on the constitutional right to present a defense.

        Finally, even if the trial court erred in excluding the evidence, any error would have been harmless.  A federal habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict."  See Brecht v. Abrahamson, 507 U.S. 619, 637

---

[19]Petitioner makes the same argument here, and, like Page, the only evidence petitioner cites that allegedly supports a theory of self-defense is the testimony of Abela discussed herein.  (Traverse at 33.)  Neither Page nor petitioner testified at trial.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4
5
6
7

(1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). The error must have resulted in "actual prejudice." <u>Id.</u> (citation omitted). Any error in excluding the evidence did not result in actual prejudice at Page's trial. The jury was not given an inaccurate picture of Bachmeier or of the incident during which Page hit him by virtue of the exclusion of the evidence of Bachmeier's violent activities. The jury heard evidence that Bachmeier had a lengthy criminal record, was a methamphetamine and marijuana user, and had given prior inconsistent statements – thereby hearing an array of information that aided it in evaluating his credibility. Also, Darby corroborated that Page and Gomez, rather than Bachmeier, were the aggressors. And Page had admitted to a police officer that they beat up Bachmeier, without mentioning that he acted in self-defense.

<u>Page v. Runnels</u>, No. C-04-1009-SI (PR), slip op. at 18-20 (N.D. Cal. Oct. 12, 2006) (Illston, J.) Petitioner and Page were similarly situated with respect to the evidence of the two assaults on Bachmeier, in that petitioner and Page carried out both assaults jointly and no evidence was admitted that Bachmeier initiated either altercation. The Court finds equally applicable to petitioner the foregoing analysis as to why the evidence regarding Bachmeier's prior acts of violence had minimal probative value, was likely to be confusing and distracting, and, any exclusion thereof was harmless under the standard set forth in <u>Brecht</u>. The Court further finds such analysis persuasive, and consequently, that the exclusion of such evidence did not violate petitioner's constitutional rights to due process or to confrontation, and was, in any event, harmless.

The excluded evidence regarding Amaro and Bernal likewise did not violate petitioner's constitutional rights. First, as to Amaro, petitioner argues the evidence of such witness's conduct with respect to her ex-husband showed her "propensity for both violence and dishonesty," and that petitioner "attacked her in defense of another." (Attachment to Petition at 5.) To begin with, evidence of Amaro's prior conduct may not be used to show her propensity to commit subsequent acts in conformity with that conduct. <u>See</u> Cal. Evid. Code § 1101(a); Fed. R. Evid. § 404(b);[20] <u>see also</u> Fed. R. Evid. § 404, Advisory Committee Notes ("'Character evidence is of slight probative value and may be very prejudicial.'" (quoting California Law Revision Commission)). Not only was the evidence of Amaro's

_____

[20]This rule has been described as "so deeply imbedded in our jurisprudence as to assume almost constitutional proportions and to override doubts of the basic relevancy of the evidence." <u>See</u> Fed. R. Evid. § 404, Advisory Committee Notes.

allegedly violent nature impermissible to show Amaro's propensity to commit violent acts,

such evidence was irrelevant, as there was no evidence that petitioner was acting in self-

defense or defending another when he kicked Amaro between her legs.  Nor do Amaro's

alleged past acts of violence have any relevance to her "propensity" for "dishonesty."[21]

Moreover, the introduction of such evidence would have been highly prejudicial to the

prosecution and would have required the jury to determine how those events transpired,

essentially by way of a mini-trial on a side issue, in addition to the question of whether

petitioner committed the acts on which the charges were based. Consequently, the exclusion

of such evidence did not violate petitioner's rights to due process or to confrontation.

   With respect to Bernal, petitioner claims the trial court improperly ruled that she could

not be cross-examined about her depression and hospitalization, or as to the facts underlying

her theft conviction.  Petitioner argues the evidence of Bernal's emotional state was relevant

to "her powers of perception and recollection."  (Attachment to Petition at 5-6.)   The trial

court did in fact allow Bernal to be cross-examined on the subject of her depression and

hospitalization, but limited such questions to the years 1995 and 1996, because the events to

which she testified, specifically, the McKnight incident, took place in January 1996.  Such

limitation was reasonable because Bernal's emotional state at or near the time of the incident

was relevant to her ability to perceive and remember that incident; any depression or

hospitalization occurring years before or after was of only minimal relevance, and also posed

a significant risk of misleading the jury as to Bernal's capacity to perceive and recall at the

time of the events on which the charges were based.  The relevance of Bernal's prior

conviction for theft was to show her character for dishonesty; evidence of that conviction was

before the jury.  The facts underlying such conviction were of little if any additional

probative value and their admission would have presented a substantial risk of undue

prejudice.  Lastly, Bernal's credibility was explored further by cross-examination as to her

use of cocaine, methamphetamine and alcohol, as well as her prior inconsistent statements

---

[21]Petitioner does not suggest, nor does the record indicate, that Amaro suffered any convictions from her alleged past acts of violence.

1    about the incident.  In sum, the reasonable limitations on cross-examination as to Bernal's

2    emotional state and prior conviction did not violate petitioner's right to due process or

3    confrontation.

4            Accordingly, petitioner is not entitled to habeas relief on this claim.

5            5.    <u>Discovery Motion</u>

6            Petitioner contends the trial court violated his rights to due process and to

7    confrontation by denying his motion, made during trial, for discovery of police personnel

8    records.  Page, who joined in the discovery motion, raised an identical claim in his federal

9    petition for a writ of habeas corpus.  In its order denying Page's petition, the district court

10   rejected the claim as follows:

11           Page claims that the trial court's denial of his <u>Pitchess</u> motion violated
     his constitutional rights to confront witnesses and to due process.[22]  During the
12   trial, Gomez filed (and Page joined) a motion to discover the personnel records
     of San Jose Police Officer Paul Ayoob, who had arrested Susan Tucker and
13   Mark Thompson on charges of forgery and possession of methamphetamine.
     The motion sought to discover any prior complaints or discipline against
14   Officer Ayoob, including information that he had fabricated evidence or
     charges and had used threats or coercion.  In his declaration supporting the
15   motion, co-defendant's counsel stated that Tucker had testified that Officer
     Ayoob had engaged in misconduct during her arrest, i.e., Officer Ayoob had
16   "suggested several things to her regarding Jeffrey Kevin Gomez and, further,
     that she should plant a gun on Mr. Gomez."  CT 3561.  Counsel further
17   declared that the defense would show that when Officer Ayoob released Tucker
     the day he arrested her, "she agreed to keep in touch with Officer Ayoob and
18   provide him with information concerning Jeffrey Kevin Gomez.  Lastly, the
     defense will show that Officer Ayoob offered lenient treatment to witness
19   Tucker, falsified his report relative to Susan Tucker, and conducted himself in a
     corrupt and patently illegal manner" on the day of her arrest.  CT 3561.  At the
20   <u>Pitchess</u> hearing, counsel also argued that Mark Thompson had testified that
     Officer Ayoob suggested to him that he plant a gun or drugs on Gomez and that

21

22
─────────────────────────
23           [22]California's <u>Pitchess</u> procedure, named for <u>Pitchess v. Superior Court</u>, 11 Cal. 3d
     531 (1974), has to do with a criminal defendant's right to discovery of peace officer
24   personnel records, specifically of complaints made against the officer.  The procedure has
     been codified.  <u>See</u> Cal. Penal Code §§ 832.7, 832.8; Cal. Evid. Code §§ 1043-1045.  The
25   <u>Pitchess</u> procedure follows two steps.  First, the defendant must make a written motion for
     peace officer personnel records that describes the records sought and that is "supported by
26   'affidavits showing good cause for the discovery or disclosure sought, setting forth the
     materiality thereof to the subject matter involved in the pending litigation and stating upon
27   reasonable belief that such governmental agency identified has the records or information
     from the records.'"  Cal. Ct. App. Opinion, p. 20 (quoting <u>California Highway Patrol v.</u>
28   <u>Superior Court</u>, 84 Cal. App. 4th 1010, 1019-20 (Cal. Ct. App. 2000).  Second, if a showing
     of good cause is made, the trial court will conduct an <u>in camera</u> review of the records to
     determine whether they are relevant to the current proceedings.  <u>Id.</u>

United States District Court
For the Northern District of California

Thompson's testimony indicated Ayoob had falsified a police report. RT 3522. The trial court took into account the testimony of Tucker and Thompson in which the statements were made as well as the materials supporting the <u>Pitchess</u> motion, and found that good cause had not been shown for the production of Officer Ayoob's personnel records.

The California Court of Appeal held that the trial court did not abuse its discretion in denying the <u>Pitchess</u> motion because the defendants had not established the good cause necessary for the documents to be produced for <u>in camera</u> review, much less to be produced to the defense. The declaration offered in support of the motion "does not adequately link the alleged misconduct with the subject matter of the litigation." Cal. Ct. App. Opinion, p. 21. The gun-planting allegation did not provide good cause because there was "no allegation that any gun was in fact planted on Gomez or anyone or that any evidence at all was fabricated." <u>Id.</u> And Officer Ayoob had no role in the arrest of either Gomez or Page. The court further explained that there was no showing that Tucker's alleged agreement to keep in touch with Officer Ayoob was improper, or that the allegedly lenient treatment offered to Tucker was connected to the case against Gomez and Page. Finally, the declaration did not explain "how an allegedly false police report by Officer Ayoob concerning Tucker impacted Gomez or Page or why it was material to their case." Cal. Ct. App. Opinion, p. 22.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. Under <u>Brady</u>, as modified by <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 58 & n.15 (1987), the petitioner must first make a preliminary showing that the file contains undisclosed material evidence if he wants judicial review of the records to determine if any should be disclosed. <u>Harrison v. Lockyer</u>, 316 F.3d 1063, 1066 (9th Cir.), <u>cert. denied</u>, 538 U.S. 988 (2003). The <u>Harrison</u> court commented: "We are not instructed on how a defendant in a criminal case will know, or be able to make, a preliminary showing that a police personnel file contains evidence material to his defense. But we are clear that the California Supreme Court has faithfully followed the United States Supreme Court [in requiring such a showing]." <u>Id.</u>

Page did not make that preliminary showing of materiality in [the] trial court, and has not made it here. Because the trial court never proceeded to the second step of the <u>Pitchess</u> procedure, i.e., <u>in camera</u> review of the records, neither the state courts nor this court know what, if anything, was in Ayoob's personnel file that was responsive to the discovery request. As was the case in <u>Harrison</u>, the absence of any evidence that there was any exculpatory evidence to be found is fatal to petitioner's due process claim. The state appellate court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court authority. <u>See</u> <u>Harrison</u>, 316 F.3d at 1066.

The state appellate court reasonably determined that Gomez and Page did not show a nexus between any prior complaints or discipline against Ayoob and their arrest and prosecution, because no gun or drugs were actually planted on Gomez or Page, and Ayoob did not participate in the arrest of either Gomez or Page. There also was no showing that the allegedly unaccepted offer of lenient treatment of Tucker was in exchange for something to be done in Page and Gomez's case. And there was no showing that the allegedly false report about Tucker's arrest had any bearing on Page and Gomez's case. In short, the alleged misdeeds of Officer Ayoob as reported by Tucker and Thompson were not shown to be material or to provide a plausible factual foundation for any

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

allegation of officer misconduct committed in connection with Page and Gomez.  See Cal. Ct. App. Opinion, ¶. 21-22.

. . .

Page also argued that the failure to grant the discovery motion violated his Sixth Amendment right of confrontation.  The Supreme Court has explained that the denial of discovery requests should be reviewed under the Due Process Clause rather than the Confrontation Clause.  See Pennsylvania v. Ritchie, 480 U.S. at 51-56.

Page, slip op. at 11-14 (footnote in original).  This Court finds the above analysis persuasive and, further, finds the denial of the discovery motion filed jointly by Page and petitioner did not violate petitioner's constitutional rights.

Accordingly, petitioner is not entitled to habeas relief on this claim.

      6.    CALJIC No. 2.20

Petitioner claims the trial court violated his right to due process by failing to grant his request to modify CALJIC No. 2.20 to include specific language that the credibility of a witness's testimony could be assessed based on whether the witness was under the influence of narcotics.  Page, who joined in the request to modify the instruction at trial, also raised the claim in his federal petition for a writ of habeas corpus.  In its order denying Page's petition, the district court rejected this claim as follows:

Page contends his right to due process was violated when the trial court refused to give a special instruction to the jury on assessing the credibility of the testimony of a person who was under the influence of drugs.  The court charged the jury with a modified CALJIC 2.20, stating in part:

Every person who testifies under oath is a witness.  You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.  [¶]  In determining the believability of a witness you may consider anything that has a tendency to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following:  [¶]  The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter [about] which the witness testified;  [¶]  The ability of the witness to remember or to communicate any matter about which the witness testified; . . . [¶]  The existence or nonexistence of a bias, interest, or other motive . . .

Cal. Ct. App. Opinion, p. 18.  The instruction also allowed the jury to consider prior criminal conduct, and any offers of immunity or leniency.  See RT 4651-4652.  The court refused Page's requested additional specific instruction that the jury could consider whether the witness was under the influence of drugs was also a factor to take into consideration in evaluating a witness' credibility.  See RT 4548.  The California Court of Appeal ruled that even if refusal to grant

the instruction was an error, there was no prejudice to Page[23], because the effects of drug usage on a witness' credibility go to perception and memory, which the jury was instructed on, and the verdict would not have changed had the instruction been given. Cal. Ct. App. Opinion, p. 18. Contrary to Page's assertion, the state appellate court did not find that there was an error; rather, that court (as courts often do) found the claim easier to dispose of by addressing the lack of any prejudice from any assumed error.

A state trial court's refusal to give an instruction does not support habeas relief unless the error so infects the trial that the defendant is deprived of the fair trial guaranteed by the Fourteenth Amendment. See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. See Duckett v. Godinez, 67 F.3d at 745. A criminal defendant is entitled to adequate instructions on the defense theory of the case, as long as some evidence supports it. See Conde v. Henry, 198 F.3d at 739. However, the defendant is not entitled to have [the] jury instructed in his or her precise terms where the given instructions adequately embody the defense theory. See United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. at 637, before granting relief in habeas proceedings.

Here, the failure to provide a specific instruction on evaluating testimony by drug users did not violate Page's right to due process. None of the cases identified by Page state that the [C]onstitution requires a special instruction as to the evaluation of a drug user's testimony. Page had no right to have the jury instructed in his precise terms because the instruction that was given adequately instructed about evaluating witness testimony. Defense counsel was able to attack the credibility of witnesses based on their drug use in his closing argument. Page's argument that the "jurors' hands . . . were tied," Traverse, p. 20, on the evaluation of drug-using witnesses' testimony is baseless.

The absence of a specific instruction that the jury should consider drug usage in evaluating witness credibility also was harmless in that it did not have a substantial and injurious effect on the jury's verdict. See Brecht, 507 U.S. at 637. Given the instructions as a whole and the entirety of evidence presented at trial, the jurors knew that Amaro, Darby, Bachmeier, and other key prosecution witnesses had histories of methamphetamine use. The jury had heard testimony that Darby and Bachmeier were under the influence of methamphetamine at the time of the burglary and assault for which Page was convicted. The jurors then were logically able to determine what effect, if any, they determined that drug use had on the ability of Amaro, Darby and Bachmeier to perceive and remember the events to which their testimony related.[24] There was no constitutional violation and no prejudice in the refusal to give an additional instruction. The state court's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law.

---

[23]The California Court of Appeal made the same finding with respect to petitioner. (Slip Op. at 18.)

[24]The same reasoning applies to the testimony of other witnesses about whom there was evidence of drug use and who provided testimony against petitioner, including Grijalva, Tucker, McKnight, and Bernal.

United States District Court

For the Northern District of California

Page, slip op. at 21-22.  The Court finds the reasoning set forth above to be persuasive and, further, concludes there was no violation of petitioner's right to due process by reason of the trial court's denial of his request to modify.

Accordingly, petitioner is not entitled to habeas relief on this claim.

7.    CALJIC No. 4.35

Petitioner claims that the failure to instruct the jury regarding a "claim of right" defense violated his right to due process.  At trial, the attorney representing Page requested CALJIC No. 4.35 and two specially-drafted instructions setting forth the claim-of-right defense.[25]  Page's theory was that he was not guilty of attempted vehicle theft because he believed he had a right to take possession of Michelle Amaro's Chevy Blazer.[26]  The trial court rejected the requested instructions, finding the evidence presented at trial insufficient to support the defense.

The California Court of Appeal similarly found the evidence was insufficient to warrant the instructions on a claim-of-right defense, explaining that, under California law with respect to specific intent crimes, such as theft, although the defendant's "belief in the mistaken facts, such as a right to the property taken or the owner's consent, need not be reasonable," the person must "act[] in the genuine belief that certain facts exist, which if true

[25]Only Page raised this claim in the Court of Appeal; petitioner did not do so.  (Slip Op. at 22.)  When Page thereafter raised the claim in his petition for review to the California Supreme Court, petitioner, pursuant to California Rule of Court 28(e)(5), joined in the claim in a separately-filed petition,  (Resp.'s Ex. 4 at 30.)  The Supreme Court summarily denied both petitions in a joint opinion.  (Resp.'s Ex. 5.)

[26]CALJIC No. 4.35 provides: "An act committed or an omission made in ignorance or by reason of mistake of fact which disproves any criminal intent is not a crime.  [¶]  Thus a person is not guilty of a crime if [he] commits an act or omits to act under an actual [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful."  (Slip Op. at 22 n.5.)
The two specially-drafter instructions read, respectively: (1) "If one takes personal property with a good faith belief that he has a legal right to take property he is not guilty of theft.  This is the case even if such good faith belief is unreasonable.  The prosecution must prove beyond a reasonable doubt that the defendants did not have a good faith belief for you to convict the defendants of theft." and (2) "It is a defense to the crime of theft that a person acted under the subjective belief, even if such belief was mistaken, that he had a lawful claim to the property which was taken."  Id.

United States District Court

For the Northern District of California

1  would make the act lawful." (Slip Op. at 23.)  The Court of Appeal further analyzed Page's

2  claim-of-right theory as follows:

> As pertinent here, the prosecutor had to show beyond a reasonable doubt
> that Page attempted to take Amaro's vehicle without her consent and with the
> specific intent to deprive her either permanently or temporarily of her title to,
> or possession of, the vehicle. (Veh. Code, § 10851.)  The requisite felonious
> intent existed only if Page intended to take Amaro's property <u>without believing
> in good faith</u> that he had a right or claim to it. (<u>People v. Tufunga</u> (1999) 21
> Cal. 4th 935, 943.)
>
> When we compare the requirements described above with the evidence
> presented, we are convinced that the instruction was not warranted.  Even if
> Page did believe he was entitled to the truck, there is no evidence to support a
> finding that such belief would be in good faith.  The fact that Amaro owed
> Gomez money and Gomez owed Page money could not mean Page was
> somehow entitled to take Amaro's truck.  That Gomez transferred Amaro's
> debt to Page is not enough.  That Gomez told Page he could take the truck is
> not enough.  Amaro testified that she never told Page that he could have the
> money or the truck.  She said that "There was no way that I'd give anybody
> that truck after I've already given him a car."  The evidence that Page used a
> crowbar to access the vehicle also undercuts any claim of good faith.  The
> evidence of defendants' threats likewise contradicts a good faith belief.  In
> sum, there was no evidence to suggest good faith by Page.  Consequently the
> trial court was not required to give the requested instructions.

(Slip Op. at 23-24.)

Although a defendant generally is entitled to have the jury instructed on his theory of
defense, a failure to do so constitutes a due process violation only where the record contains
some evidence to support the instruction. See <u>Duckett v. Godinez</u>, 67 F.3d 734, 743 (9th Cir.
1995).  A determination as to whether such a violation occurred will depend on the evidence
presented at the trial and the overall instructions given to the jury. <u>Id.</u> at 745; <u>Solis v. Garcia</u>,
219 F.3d 922, 929-30 (9th Cir. 2000) (finding no duty to instruct on voluntary manslaughter
as lesser included offense where evidence presented at trial did not support instruction on
heat of passion or imperfect self-defense).

In his federal petition, Page raised the same claim petitioner raises herein, namely, that
the failure to provide the above-referenced instructions on a claim-of-right defense violated
his right to due process. <u>Page</u>, slip op. at 4.  The claim was denied because of the absence of
evidence either that the debt was liquidated and for a sum certain, or that Page believed he
had a lawful right to the Blazer, both of which are necessary to establish the defense under
California law. <u>Id.</u> at 8-11 (citing <u>People v Romo</u>, 220 Cal.App.3d 514, 518 (Cal. Ct. App.

1   1990) (holding claim-of-right defense requires subjective belief in lawful right to property);

2   People v. Holmes, 5 Cal.App.3d 21, 24 (Cal.Ct.App. 1970) (holding claim-of-right defense

3   inapplicable to unliquidated debts)).  The district court's analysis was as follows:

> There are two problem areas for Page's argument that a claim-of-right instruction should have been given: (1) the absence of any evidence that the debt was liquidated and for a sum certain and (2) the absence of evidence that he believed he had a lawful right to take the Blazer.
>
> The evidence was that the existence and amount of the debt were hotly disputed.  Page has not pointed to any evidence that the debt Amaro allegedly owed was liquidated or certain in amount.  Amaro testified that the debt had been satisfied ("squashed," in her words) when she signed over her Pontiac to Gomez in satisfaction of the debt for the 280Z she earlier bought.  RT 1995, 2046.  Gomez unilaterally revived the debt or created a new one when the Pontiac's engine blew out just a few weeks after Amaro signed it over to satisfy the debt.  RT 1996.  There is no evidence that Amaro voluntarily agreed to a revival of the debt or to the creation of a new one.  She told Gomez she wasn't going to pay him and Gomez said he'd "blow my fuckin' head off" and Gomez's assistant, Martin Lopez, revealed that he was carrying a shotgun.  RT 1996-1997.  Even assuming that there was sufficient evidence that a debt existed, the amount of that debt was hotly disputed -- depending on what testimony one wanted to believe, Amaro had paid somewhere between $100 and $1600 cash plus the Pontiac -- and there was no evidence of any particular amount that Amaro owed on the day Page tried to take the Blazer.  Gomez thus had at best an unliquidated claim against Amaro.  The claim-of-right defense did not apply to the disputed debt under California law.  See Barnett, 17 Cal. 4th at 1144; Holmes, 5 Cal. App. 3d at 24; Poindexter, 255 Cal. App. 2d at 570.
>
> Second, there was not enough evidence that Page believed he had a lawful right to take the Blazer so as to require that the instruction be given. Page distorts the meaning of Amaro's testimony in suggesting Amaro felt a contractual obligation to pay Page.  When taken in context, Amaro's testimony was that fear rather than a contractual duty made her feel she had to pay Page. Turning over the Pontiac "squashed" the debt to Gomez in Amaro's mind and the revival of the debt was unilateral by Gomez and done with a shotgun looming in the background.  The transfer of the alleged debt to Page was presented to her as a fait accompli and she was informed that failing to pay that debt would be detrimental to her health.  Gomez told Amaro that, since she owed Gomez and Gomez owed Page money, "the debt was now resumed over to Larry" Page.  RT 2001.  At the meeting where Amaro was informed of the transfer of the debt, Gomez, Page and Martin were all present and she was told by Gomez that she would be hurt if she didn't pay.  RT 2003.  She felt she should pay Page because of what she had known of his reputation from the past.   RT 2002, see also RT 2087-2088; cf. RT 2441 and 2448 (with regard to a different debtor, Page admitted to a police officer that he sometimes was brought along because he intimidated people based on his violent reputation). Amaro was not, however, personally afraid of Page and he never personally threatened her.  RT 2077, 2097-2098.  She tried to reconcile the statements by saying that Page had never harmed her but had a reputation.  The debt collection activities sometimes involved implicit or explicit threats and sometimes were done while Gomez was accompanied by Martin who revealed that he was carrying a shotgun.  See, e.g., RT 1997, 2011, 2090.  Amaro did not offer the Blazer in exchange for the alleged debt; rather, Gomez told her it was going to be taken if she did not pay.  RT 2004.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Page also has not pointed to evidence of the amount of the debt Gomez allegedly owed to Page that purportedly gave him the right to take property to collect on that debt. The evidence does not show whether Gomez owed him, for example, ten dollars or a million dollars. The absence of this evidence goes to the bona fides of his claimed right to take the Blazer. The absence of the evidence also impairs a determination that the Gomez-Page debt was for a fixed amount.

In sum, there was no evidence that Page believed that he had a <u>lawful</u> claim on the Blazer. Whether it is expressed as a "good faith belief in a right" or as an "actual belief in a lawful right," the defense is based on the idea that the defendant thought the law allowed his conduct and the word "right" implies authorization by law. <u>See, e.g., Butler</u>, 65 Cal. 2d at 573 ("bona fide belief, even though mistakenly held, that one has a right or claim to the property"); <u>Poindexter</u>, 255 Cal. App.2d at 569 ("good faith, though erroneous, belief that he had a right or claim to the property taken"); <u>Romo</u>, 220 Cal. App. 3d at 519 (citing <u>Butler</u> and referring to the standard as a "subjective belief he or she had a lawful claim on the property"). Even Page's proposed jury instruction mentioned the need for the defendant to have a good faith belief in a "legal right to take property." <u>See</u> footnote 1, <u>supra</u>. Although the California Court of Appeal did not specifically articulate this point, it is doubtless implicit in its analysis as it rejected the argument that Page's alleged belief in his right was in good faith. <u>See</u> Cal. Ct. App. Opinion, p. 24. Page's statements that he had a right to take the Blazer were not enough to allow the inference he believed he had a <u>lawful</u> right. There is a difference between, "Because you owe me money, I'm going to take something from you to make up for it" and "Because you owe me money, the law allows me to take something of yours to make up for it." Only the latter point would provide a good faith claim-of-right defense. Furthermore, the insubstantiality of the evidence is even more noteworthy when one views the statements in the context that the debtor was being intimidated and threatened with physical harm.

Page's separate argument that he thought Amaro had given him permission to take the Blazer had almost no evidentiary support. The minuscule amount of evidence on the point consisted of Amaro's testimony that, when she said she was going to try to get the money from her mother to pay Page, it was possible that Page may have misunderstood that he could have the money or the vehicle. RT 2083.[27] No testimony was elicited regarding the basis for Amaro's speculation. By contrast, Amaro provided lots of testimony that she did <u>not</u> give anyone permission to take the Blazer. She had not signed her Blazer over to anyone and no one had her permission to take the Blazer. RT 2015, 2082. There was no testimony that Page told the homeowner that Amaro had given him permission to take the Blazer when he showed up to take it. Rather, he just said "that was his car, that Jeff [Gomez] owed him some money, and Jeff was going to give him that car so he could take it." RT 1632. Page told the homeowner that Gomez, not Amaro, consented to him taking the Blazer. RT 1654, 1664. The paltry amount of evidence supporting any claim that Page mistakenly thought he had Amaro's permission to take the Blazer did not require a mistake of fact or claim-of-right instruction. There was no due process violation and no harmless error in failing to give the instruction based on a theory that Amaro gave Page permission to take the Blazer.

---

[27]The totality of the evidence on the point consisted of this exchange: "[Question by Mr. Tursi]: And at that point in time, is it possible that the misunderstanding took place where Larry thought that he would have the money or the car? [Answer by Ms. Amaro]: Possibly, yeah." RT 2083.

1

2

3

4

      The California Court of Appeal's rejection of Page's due process claim was not contrary to or an unreasonable application of clearly established federal law.  Like the state appellate court, this court does not believe that Page was entitled to a claim-of-right instruction under state law based on the evidence presented at his trial.  Due process was not violated by the failure to provide an instruction to which the defendant was not entitled on the evidence.

<u>Page</u>, slip op. at 8-11 (footnote in original, and renumbered).

5

6

      In the instant petition, petitioner does not argue that he had a claim-of-right defense or

7

that there was evidence he had a good faith belief he had a right to Amaro's Blazer.  Such an

8

argument clearly would fail, as the evidence was undisputed that petitioner had assigned

9

Amaro's debt to Page and, having done so, that he no longer believed he had a right to the

10

Blazer.  Instead, petitioner argues that after the assignment of Amaro's debt to Page, it was

11

Page who believed he had a right to the Blazer, and thus that Page had a claim-of-right

12

defense.  Petitioner does not explain how a claim-of-right defense on behalf of Page would

13

have helped petitioner.[28]  To the extent petitioner means to argue that if Page, based on a

14

good-faith belief that Page had a lawful claim, had a viable defense to the taking of the truck,

15

petitioner, as Page's accomplice in such taking, likewise would not be guilty of theft even

16

though petitioner did not himself hold such good-faith belief.  Petitioner cites no authority,

17

and this Court is aware of none, holding petitioner could be exonerated in such fashion, or,

18

indeed, that one defendant has a due process right to instructions requested solely on behalf

19

of a co-defendant.  Even if such authority exists, however, petitioner's claim would be

20

premised on there having been evidence sufficient to warrant a claim-of-right instruction as

21

to Page in the first instance.  In that regard, this Court finds persuasive the district court's

22

decision to the contrary, as set forth above, and, for the reasons stated therein, finds the

23

evidence at trial did not warrant instructions on a claim-of-right defense.  Consequently, the

24

failure to provide such instructions did not violate petitioner's right to due process.

      Accordingly, petitioner is not entitled to habeas relief on this claim.

25

26

27

28

[28]Indeed, the claim in the instant petition reads as if it were copied directly from Page's petition, as it contains no explanation as to how it applies to petitioner.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8.      CALJIC No. 17.41.1

Petitioner claims the use of CALJIC No. 17.41.1, which instructs jurors to inform the court of other jurors' misconduct, violated his right to a unanimous jury.  This claim has been rejected by the Ninth Circuit, which has held the use of CALJIC No. 17.41.1 is neither contrary to nor an unreasonable application of Supreme Court precedent.  See Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting under AEDPA habeas claims based on use of CALJIC No. 17.41.1).

Accordingly, petitioner is not entitled to habeas relief on this claim.

9.      Cumulative Error

Petitioner claims the cumulative effect of all of the foregoing asserted trial errors caused his trial to be fundamentally unfair, in violation of his right to due process.  Petitioner cites no Supreme Court precedent, and the Court is aware of none, providing that the cumulative effect of multiple alleged errors, none of which is of constitutional dimension, may violate a defendant's due process right to a fair trial.  As discussed above, AEDPA mandates that habeas relief may be granted only if the state courts have acted contrary to or have unreasonably applied federal law as determined by the United States Supreme Court. Williams v. Taylor, 529 U.S. at 412 ("Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence.").  Consequently, in the absence of Supreme Court precedent recognizing a claim of "cumulative error," habeas relief cannot be granted on such theory.

In any event, for the reasons discussed above, the Court has found no constitutional error exists, let alone multiple errors.  As there have been no errors to accumulate, there can be no due process violation based on a theory of "cumulative" error.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (holding where there are no errors, there can be no cumulative error).  Consequently, petitioner's claim, even if it were based on United States Supreme Court precedent, would fail.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**CONCLUSION**

For the reasons discussed, the petition for a writ of habeas corpus is hereby DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: March 27, 2007

_____
MAXINE M. CHESNEY
United States District Judge